**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| **WAITBUSTERS LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**ORACLE CORPORATION**<br><br>Defendant. | C.A. No. 1:26-cv-01955<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff WaitBusters LLC, files this Complaint for Patent Infringement against Oracle Corporation, and would respectfully show the Court as follows:

### I.  THE PARTIES

1.      Plaintiff WaitBusters LLC ("WaitBusters" or "Plaintiff") is a Virginia limited liability company, having a principal place of business located at 71 Sawmill Road, Clarksville, VA  23927.

2.      On information and belief, Oracle Corporation ("Oracle" or "Defendant") is a corporation organized and existing under the laws of Delaware with a place of business at 2300 Oracle Way, Austin, Texas 78741.  Defendant has a registered agent at Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### II.  JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4.    On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the acts of infringement alleged herein.  Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains its "World Headquarters"—and thus a place of business—at 2300 Oracle Way, Austin, Texas 78741.

5.    Without limitation, on information and belief, within this state, Defendant has made, used, sold, and offered for sale, the patented inventions, and induced use of the patented inventions, thereby committing, and continuing to commit, acts of patent infringement alleged herein.  In addition, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas.  Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas.  Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its providing services within Texas.  By way of example and without limitation, Defendant implements its Simphony POS and KDS technology in restaurants in Austin, Texas, in connection with goods and/or services that, on information and belief, are included within infringing activities subject to this Complaint.  Defendant has committed such purposeful acts and/or transactions in Texas such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

6.    Venue is proper in this district under 28 U.S.C. § 1400(b).  On information and belief, Defendant maintains its World Headquarters—and thus a place of business—at 2300

Oracle Way, Austin, Texas 78741.  Defendant has committed at least a portion of the infringements at issue in this case from and/or within this District.

7.      For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

### III.  UNITED STATES PATENT NO. 11,367,125

8.      Plaintiff incorporates the above paragraphs herein by reference.

9.      On June 21, 2022, United States Patent No. 11,367,125 ("the '125 Patent") was duly and legally issued by the United States Patent and Trademark Office.  The '125 Patent is entitled "Systems and Methods for Processing Electronic Requests."  The term of the '125 Patent has been adjusted by 255 days.  A true and correct copy of the '125 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10.      WaitBusters is the assignee of all right, title, and interest in the '125 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '125 Patent.  Accordingly, WaitBusters possesses the exclusive right and standing to prosecute the present action for infringement of the '125 Patent by Defendant.

11.      The '125 Patent relates to systems and methods that provide interconnectivity between ordering platforms (e.g., DoorDash, Uber Eats, and others), and different restaurant computing systems, so that end-users using their own devices can interact with interfaces to place orders from the restaurants.  (Ex. 1 at col. 1:18-30).  The inventors recognized that there were a host of technical challenges at the server side including, for example, different third-party platforms utilizing different and sometimes incompatible data formats, thereby creating problems at the client-side (restaurant side) by requiring a single restaurant to own multiple hardware

devices, each specific to a different third-party ordering platform. (*Id.* at col. 1:30-40). The inventors further recognized that requiring each restaurant to own and manage multiple hardware devices, one for each third-party ordering platform, led to inefficiencies and a waste of computing resources. (*Id.* at col. 2:8-16.)

12.    Shane Gau and James Moody are the inventors of the '125 Patent. (Ex. 1 at cover). Mr. Moody is the founder and Manager of WaitBusters.

**Background of the Inventions**

13.    WaitBusters is a service-disabled veteran-owned small business, founded by Mr. Moody in June 2016. Mr. Moody is a retired Navy officer, who rose through the ranks prior to competitive selection into the Navy's Enlisted Scientific Education Scholarship Program (NESEP). The United States Navy, via NESEP, enabled Mr. Moody to attend The University of Mississippi, from which he graduated with a Bachelor of Science degree in Computer Science. Upon graduation, Mr. Moody was commissioned as an Ensign and assigned as a Surface Warfare Officer and Electronic Warfare Division Officer on the USS Forrestal.

14.    Mr. Moody had an industrious career in the Navy, including assignments as the Navy/Marine Corps Liaison for the Defense Manpower Data Center (DMDC) and Defense Enrollment Eligibility Reporting System (DEERS). As his final assignment with the Navy, Mr. Moody served as the Deputy/Acting Program Manager for the DOD RAPIDS/Common Access ID card (CAC) program. He and his team formulated the concept for the DOD CAC card, and successfully lobbied senior executives to fund and implement this program. In essence, Mr. Moody set the foundation for, and helped implement, the Department of Defense's ID card program.

15.     Following retirement from the Navy, Mr. Moody worked for several small and large IT consulting firms, during which time he continued consulting with the DOD in a civilian role.  He founded Veterans Enterprise Technology Solutions (VETS), Inc. in 2005, and has served as an SBA-approved mentor to a number of small businesses, and as an informal mentor to others.

16.     About 10 years after forming VETS, Mr. Moody stopped by a restaurant on a trip to visit family.  It was there that he wondered why there wasn't a better way to serve the 30-40 other people who were waiting in line with him.  Mr. Moody was aware that some restaurants would distribute pagers to patrons who were waiting for a table, but he was also aware of the inherent limitations of pagers related to range and limited stock.

17.     After investigations, Mr. Moody sensed that there was an opening in the market for wait line management techniques.  He then hired Mr. Gau to further assess the feasibility of a technology-based improvement to restaurant wait line management.  After about 4-5 months of research and development, Mr. Moody and Mr. Gau implemented a system that, along with a host of other features, enabled patrons to use smartphones and other Internet-connected  devices to get in lines remotely at a specified date and time with a defined number of people in the party, and enabled restaurants to track who was in line, whether they were running late, etc. WaitBusters was born, providing technology solutions that benefited both patrons and restaurants.

18.     WaitBusters continued its R&D work, expanding its operations and commercial product offerings to enable online reservations and then online ordering.

19.     Mr. Moody was travelling once again, and noticed the same thing at restaurant after restaurant:  Each restaurant had a number of different tablets on a counter, oftentimes next

to a phone, with one tablet for DoorDash, another for Uber Eats, etc.  In order for a given restaurant to accept orders from these popular third-party delivery platforms, it would have to have a dedicated tablet for each.

20.    Initially, Mr. Moody sought a way of streamlining the communications and simplifying device setup.  He worked with Mr. Gau, by then WaitBusters' Chief Product Officer, to dig deeper into the technological challenges associated with "integrations," and to develop technological solutions to them.  These research endeavors led to the '125 Patent, and a commercial technology solution included in WaitBusters' Digital Diner product.

21.    WaitBuster's Digital Diner was hailed as a solution to "tablet turmoil."  See https://www.restaurantnews.com/digital-diner-solves-tablet-turmoil-031419/ RestaurantNews.com provided the following explanatory graphic:



22.    WaitBusters has continued to innovate, bringing to market still further restaurant and patron focused technology solutions.  Over time, WaitBusters has had regional sales teams

based in Texas, San Francisco, and Florida, and near its headquarters in Clarksville, Virginia. WaitBusters' reach has expanded yet farther through partnerships with technology partners offering complementary services. WaitBusters has supplied its third-party platform integration products to hundreds of restaurants around the country, and continues to offer those and other technology-based solutions to restaurants today.

**The Invention of the '125 Patent and Its Inventive Concepts and Advantages**

23.     Restaurants have been accepting orders via third-party delivery platforms (such as DoorDash, Uber Eats, etc.) for years. But prior to the '125 Patent, restaurants had to use separate hardware devices for each of the third-party delivery platforms because each platform sent data in its own proprietary data format, and those formats were incompatible with one another. (Exhibit 1, col. 1:46-61.) This created "tablet turmoil," where restaurants needed to obtain and maintain multiple different hardware components, and then manage different displays, all because of the different data formats being used. (*Id.*)

24.     The '125 Patent describes, in an example embodiment, an analytic server that acts as a central hub to aggregate requests from multiple third-party platforms for a single device for a given restaurant. (*Id.*, col. 2:32-35; col. 5:53-55.) The server is configured to receive multiple streams of electronic messages corresponding to orders initiated through various third-party service provider computers. (*Id.*) To process these messages, the analytic server executes an extraction protocol. (*Id.*, 2:35-37; col. 5:56-61.) This protocol parses text of the messages to identify the restaurant to which the order is directed and extracts pertinent details such as order items and totals. (*Id.*, col. 2:54-57; col. 5:65 to col. 6:8).

25.     The server generates a normalized machine-readable file from this disparate incoming data. (*Id.*, col. 2:34-40; col. 6:9-23.) The normalized data is readable by hardware at

the restaurant and, ultimately, the restaurant is able to view the data in a single, consistent format as if it were received in a consistent format regardless of the actual source and true format of original request.  (*Id.*, col. 2:41-43; col. 6:9-23; 6:58 to col. 7:6.)

26.    In that regard, the system transmits the machine-readable file to the identified merchant computing device, such as a tablet or other POS system.  (*Id.*)  The device uses the file to populate a unified GUI that displays comprehensive details like customer names, phone numbers, and delivery addresses, in a consistent manner.  (*Id.*)

27.    The '125 Patent facilitates the migration from multiple separate dedicated third-party apps and tablets to a restaurant's internal ordering platform in a singular, unified manner. This integration facilitates more connections in a streamlined manner while maintaining uniformity.

28.    The '125 Patent claims are directed to a technical improvement in computer networking and data processing architecture.  The '125 Patent discusses a specific technical bottleneck, namely, different delivery platforms use incompatible data formats and often require separate, dedicated hardware.  The '125 Patent describes a specific system architecture that makes use of an intermediate analytic server and an extraction protocol to normalize and aggregate these disparate data streams, thereby providing a technical solution to this technical incompatibility problem.  The '125 Patent claims provide a solution necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.  The '125 Patent claims are not directed to, and do not recite, merely ordering food from different service providers.  Instead, the '125 patent harmonizes heterogeneous network data by implementing an extraction protocol at a server, enabling

disparate components to communicate with one another in a streamlined manner, and providing technical advantages for client sites including the complete elimination of hardware devices.

29.     Further, rather than merely automating a manual process, the '125 Patent claims improve computer functionality in several respects, including in terms of how a client device operates at restaurant locations.  The generation of a machine-readable file to aggregate data from multiple third-party servers allows a single merchant device to perform a task (unified monitoring and/or processing) that previously was technically hindered by software and hardware silos resulting from the "walled gardens" of third-party providers.  And by extracting and reformatting data into a specific machine-readable file used to populate a graphical user interface (GUI), the '125 Patent claims effectively reduce processing overhead and hardware requirements on the restaurant side.  The elimination of multiple hardware components confirms that the '125 Patent claims yield a concrete improvement.  Individually and collectively, these technical advantages reflect data integration and computer operational efficiency enhancements.

30.     The '125 Patent claims further recite features that, individually and as an ordered combination, amount to significantly more than well-understood, routine, or conventional activities.  For example, the claimed extraction protocol helps to transform messages from multiple service provider computers into a specific machine-readable file for a restaurant's client device is a specific implementation rather than a generic computer performing a generic task. The '125 Patent also claims a specific architecture that does not preempt all ways of managing orders.  Instead, it specifically requires the use of an analytic server acting in a particular manner, in essence, as a bridge.  This ordered combination of steps provides a specific tool for developers to handle API and data format fragmentation, as is common given the technological limitations imposed by the specific data formats imposed by different third-party platforms.

31.     The above demonstrates that the claims are not directed to, and certainly recite significantly more than, a human obtaining the name of a product, the name of the customer who purchased it, the name of the sales entity that brokered the sale, and the name of the supplier who provides the product and outputting to a list containing the name of the purchased product and the name of the sales entity that brokered the sale.

32.     A human mind, with or without pen and paper, is not equipped to follow the specific technical path of the '125 Patent claims.  That is, a human mind, with or without pen and paper, is not equipped to intercept data streams from multiple third-party platforms arriving in different formats and at a potentially high velocity, execute an extraction protocol, generate a machine-readable file suitable for end-devices, and then forward this file to a specifically-identified machine to cause a particular kind of GUI population.  The GUI itself with specific indicators is a particular UI improvement over, for example, the fragmented approach where different tablets used different displays for orders originating from different third-party platforms.

33.     The above also confirms that the '125 Patent claims are not directed to, and do not recite, organizing human activity at all.  The '125 Patent claims provide concrete technical improvements to problems specific to fragmented computing environments, where different third-party computing platforms provide different APIs and different data formats.

## IV.  COUNT I
### (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 11,367,125)

34.     Plaintiff incorporates the above paragraphs herein by reference.

35.     Defendant has infringed and continues to infringe at least claim 1 of the '125 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, and/or offering for sale in the United States or importing into the United

States infringing products and/or services constituting the Accused Instrumentalities and infringing methods relating thereto, and/or contributing to and/or inducing others to do the same. Defendant derives revenues from the activities relating to the Accused Instrumentalities.

36.    For example and without limitation, the Accused Instrumentalities include Oracle's Simphony POS and Kitchen Display System (KDS), and integrations, working alone and/or in concert with one another, and methods relating to same.  On information and belief, Oracle provides its own direct integrations to third-party delivery platforms such as DoorDash, Uber Eats, and others.  On information and belief, Oracle provides its own cloud-based POS systems which at least in part constitute the Accused Instrumentalities.  Defendant is a direct infringer of the '125 Patent.  Oracle directly performs, or causes to be performed by its actions, products, and/or instructions, all steps required by the claims of the '125 Patent.

37.    Exhibit 2 (claim chart) is incorporated herein by reference.  As illustrated in Exhibit 2, Defendant infringes at least claim 1 of the '125 Patent.

38.    Defendant took the above actions intending to infringe and/or cause infringing acts by others.  For example, Defendant advertises that "Oracle MICROS Simphony is a cloud-based Point-of-Sale (POS) solution that provides business management capabilities using a single tool with vast integration capabilities to property management systems, paperless kitchen display systems, credit card interfaces, and reporting applications." https://docs.oracle.com/en/industries/food-beverage/simphony/19.4/simdc/c_preface.htm. Defendant advertises that its products are "[b]uilt on a cloud-based open API framework with more than 200 integration partners, [so that] Simphony POS gives you the freedom to tailor the platform to your unique needs."  https://www.oracle.com/food-beverage/restaurant-pos-systems/simphony-pos/.  Oracle provides detailed instructions for onboarding different third-

party ordering platforms.  *See*, for example, https://docs.oracle.com/en/industries/food-beverage/simphony/19.4/simdc/c_food_delivery_doordash.htm for detailed instructions on how to connect Simphony to DoorDash and https://docs.oracle.com/en/industries/food-beverage/simphony/19.5/simad/c_food_delivery_uber_eats.htm for detailed instructions on how to connect Simphony to Uber Eats.

39.    WaitBusters has complied with all marking requirements.

40.    The claims of the '125 Patent are method claims.  Defendant has had knowledge of the '125 Patent and its infringement prior to the filing of this Complaint.

41.    WaitBusters advised Defendant of the '125 Patent and its infringement by letter dated March 4, 2026, which was received by Defendant on March 10, 2026.  WaitBusters specifically requested that Defendant "respond . . . if you believe there is any reason why you do not infringe the '125 Patent."  To date, Defendant has not responded to WaitBusters.  Therefore, Defendant has had knowledge of the '125 Patent and its infringement since at least March 10, 2026, i.e., the receipt date of the letter.

42.    Defendant also actively, knowingly, and intentionally induces, and has induced, infringement of at least claim 1 of the '125 Patent under 35 U.S.C. § 271(b) at least by actively encouraging others to make, use, sell, and/or offer to sell the Accused Instrumentalities and corresponding methods.

43.    On information and belief, Defendant also contributes to the direct infringement committed by others, such as customers and end users, in the United States.  Defendant's affirmative acts of selling and offering to sell the Accused Instrumentalities and causing the Accused Instrumentalities to be manufactured, used, sold, and offered for sale contribute to customers' and end users' use of the Accused Instrumentalities, such that the '125 Patent is

directly infringed.  The accused components within the Accused Instrumentalities are material to the invention of the '125 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be especially adapted for use in infringement of the '125 Patent.  Defendant has performed and continues to perform these affirmative acts with knowledge of the '125 Patent and with intent, or willful blindness, that they cause the direct infringement of the '125 Patent.

44.    Defendant's acts of infringement have caused damage to WaitBusters. WaitBusters is entitled to recover from Defendant the damages sustained by WaitBusters as a result of Defendant's wrongful acts in an amount subject to proof at trial.

45.    Defendant's acts of infringement have been and continue to be willful.

46.    WaitBusters provides the foregoing explanation of infringement with regard to an exemplary claim compared to exemplary functionality.  WaitBusters reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified herein and for other claims and functionalities of the goods and services provided by and through Defendant.

## V.  JURY DEMAND

47.    Plaintiff requests a trial by jury of any issues so triable by right.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claim 1 and all other asserted claims of United States Patent No. 11,367,125 was/were and is/are infringed, either literally and/or under the doctrine of equivalents, by Defendant;

b. Judgment and order finding that Defendant's infringement has been willful;

c. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

e. Permanent injunction prohibiting Defendant from further acts of infringement;

f. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

July 15, 2026                                         Respectfully submitted,


                                                     */s/ Trey Yarbrough*
                                                     Trey Yarbrough
                                                     Bar No. 22133500
                                                     trey@yw-lawfirm.com
                                                     YARBROUGH WILCOX, PLLC
                                                     100 E. Ferguson St., Suite 1015
                                                     Tyler, Texas 75702
                                                     (903) 595-3111 phone
                                                     (903) 595-0191 fax

                                                     Jonathan A. Roberts (*pro hac vice* forthcoming)
                                                     Joseph A. Rhoa (*pro hac vice* forthcoming)
                                                     NIXON & VANDERHYE, PC
                                                     901 N. Glebe Road, Suite 1100
                                                     Arlington, Virginia 22203
                                                     (703) 816-4000 phone
                                                     (703) 816-4100 fax
                                                     jr@nixonvan.com
                                                     jar@nixonvan.com

                                                     *Attorneys for Plaintiff*
                                                     *WaitBusters LLC*